**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JEFFREY A. BURNS,

Plaintiff,

v.

CREATIVE DINING SERVICES, INC.,

Defendant.

Case No. 1:26-cv-2939

Hon. ___________________

**COMPLAINT AND JURY DEMAND**

Plaintiff Jeffrey A. Burns, through counsel, SAG LAW P.C., alleges as follows:

## I. NATURE OF THE ACTION

1. Jeffrey Burns served for nearly four years as the general manager of the Brandywine Creek Conference Center for Creative Dining Services, Inc. Defendant's produced personnel records contain no warning, disciplinary action, or negative performance evaluation concerning Mr. Burns before his discharge.

2. Defendant discharged Mr. Burns effective January 8, 2026, citing newly asserted performance and on-site-presence concerns. Before then, Defendant had not given him a written minimum-presence requirement, counseled him about his schedule, or given him an opportunity to answer the accusations later used against him.

3. The operations director who helped assemble the case against Mr. Burns had allowed a white subordinate at the same account to work remotely full time for six months. A facilities manager also recorded that two white predecessors in Mr. Burns's role had not been at the property often and that he had understood their absences.

4. Defendant's inquiry relied heavily on three white subordinates who reported to Mr. Burns. Defendant did not interview Mr. Burns, show him the accusations, or ask him to respond. Its final reasons tracked the account of a subordinate whom Mr. Burns had recently told he would have to begin documenting because of staff turnover.

5. Mr. Burns is Black and Hispanic. He alleges that Defendant would not have discharged him for the same conduct had he been white.

6. Mr. Burns brings claims for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 1981, and the Michigan Elliott-Larsen Civil Rights Act. He also seeks the performance bonus he alleges he earned before Defendant discharged him.

## II. JURISDICTION AND VENUE

7. This Court has federal-question jurisdiction under 28 U.S.C. 1331 and jurisdiction over the Title VII claim under 42 U.S.C. 2000e-5(f)(3).

8. This Court has supplemental jurisdiction under 28 U.S.C. 1367 over the Elliott-Larsen Civil Rights Act and contract claims because they arise from the same employment relationship, discharge, and course of conduct as the federal claims.

9. Venue is proper under 28 U.S.C. 1391(b) and 42 U.S.C. 2000e-5(f)(3). The challenged employment practices occurred in this District, relevant employment records are maintained in this District, and Mr. Burns worked in this District.

10. Assignment to the Southern Division is proper under W.D. Mich. LCivR 3.2 because the claims arose in Van Buren and Ottawa Counties.

## III. PARTIES

11. Plaintiff Jeffrey A. Burns is an adult resident of Comstock Park, Kent County, Michigan. He is Black and Hispanic. At all relevant times, he was Defendant's employee within the meaning of Title VII and the Elliott-Larsen Civil Rights Act.

12. On information and belief, Defendant Creative Dining Services, Inc. is a Michigan corporation with its principal place of business at 1 Royal Park Drive, Suite 3, Zeeland, Michigan 49464. Defendant operates hospitality and food-service accounts, including the Brandywine Creek Conference Center in Covert, Michigan. Defendant employs more than 500 employees and is an employer within the meaning of Title VII and the Elliott-Larsen Civil Rights Act.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. On May 20, 2026, Mr. Burns filed a verified Charge of Discrimination with the Equal Employment Opportunity Commission, Charge No. 471-2026-05465, checking race, color, and retaliation.

14. The EEOC issued a Determination and Notice of Rights on July 23, 2026.

15. This action is brought within 90 days after the EEOC issued its July 23, 2026 notice of rights.

## V. FACTUAL ALLEGATIONS

### A. Mr. Burns's role and record

16. Defendant hired Mr. Burns effective February 7, 2022, as the salaried general manager of the Brandywine Creek Conference Center. He managed the hotel and conference operation and an annual budget of approximately $2 million.

17. Mr. Burns's written offer set a starting salary of $115,000 and described a bonus incentive program of up to 12 percent of semiannual salary. The stated components included unit financial targets, sanitation and operational targets, and individual unit leadership performance.

18. Defendant recruited Mr. Burns knowing that he lived approximately one hour from the property. During his final interview, Defendant asked whether he would relocate closer to the property. Mr. Burns said he would not, and Defendant hired him.

19. Defendant's produced personnel records contain no warning, disciplinary action, or negative performance evaluation concerning Mr. Burns before his discharge.

20. Defendant used top-of-account bonus scorecards to evaluate account leaders. Mr. Burns recalls completing scorecards throughout his employment and satisfying the applicable criteria. Defendant retained the scorecards and ended his access to them when it discharged him.

21. Before the investigation that led to his discharge, Defendant's leaders had not told Mr. Burns that his performance was deficient. Mr. Burns recalls repeated positive feedback about his work and the account.

22. No writing produced to Mr. Burns set a minimum number of hours that a salaried general manager had to be physically present at the property. Before discharging him, Defendant did not give him a post-hire warning, counseling, or corrective instruction about his on-site schedule.

**B. Defendant treated on-site presence flexibly for white employees**

23. Haleigh Hayes, a white employee, served as the administration and conference services manager at Brandywine Creek. She reported to Mr. Burns and also reported upward to Operations Director Michael Church.

24. After Ms. Hayes returned from maternity leave, Mr. Church allowed her to work from home full time for approximately six months. Mr. Burns knew of the arrangement because he administered it.

25. Mr. Church later relied on Ms. Hayes as a source for the claim that Mr. Burns was not sufficiently present on site.

26. Brian Wood, Defendant's facilities manager, recorded in his notes that Jay Sharkey and Janine Oberstadt, two white predecessors in Mr. Burns's general-manager role at the same account, had also not been at the property often and that he was used to it and understood it.

27. Defendant's Attendance Policy defines absences and tardiness by reference to scheduled work times. Mr. Burns was a salaried general manager without a scheduled shift.

28. Based on Mr. Burns's experience managing Defendant's employees, Defendant ordinarily expected performance concerns to be raised and documented before discharge. Defendant did not raise or document any such concern with Mr. Burns before the inquiry described below.

**C. Defendant conducted a one-sided inquiry**

29. Three managers at Brandywine Creek reported to Mr. Burns: Executive Chef Katie Nickles, Facilities Manager Brian Wood, and Ms. Hayes. All three are white.

30. Before the inquiry began, Mr. Burns had told Ms. Nickles that Defendant would have to begin documenting her performance because of staff turnover at the account.

31. On or about November 20, 2025, Ms. Nickles's complaints about Mr. Burns reached Vice President Janine Oberstadt through Mr. Sharkey. Defendant's internal notes record Mr. Sharkey reporting that Ms. Nickles held significant resentment toward Mr. Burns because she believed she worked longer hours than he did.

32. In December 2025, Defendant began gathering information about Mr. Burns without telling him.

33. On December 10, 2025, Mr. Church conducted what Defendant's records call an on-site audit. It lasted approximately 70 minutes on one morning.

34. Defendant gathered notes and statements from Ms. Nickles, Mr. Wood, and Ms. Hayes.

35. On December 19, 2025, Mr. Church prepared two internal reports recommending disciplinary action. One report identified the sources Defendant consulted, but did not identify Mr. Burns as a source.

36. Before his discharge, Defendant did not interview Mr. Burns, show him any accusation, identify a complainant, or give him an opportunity to respond. Off-boarding interviews, an opportunity to respond to employee conduct were provided to other employees in the Defendants history of existence but this was not afforded to Mr. Burns.

37. One report stated that Defendant could not substantiate Mr. Burns's account that he attended meetings at Defendant's home office and conducted benchmarking work. Defendant did not ask Mr. Burns or its own home-office personnel to verify that work before discharging him.

38. Mr. Wood's raw notes described Mr. Burns's schedule as longstanding, stated that there was nothing new about it, and said that he could not say it had worsened. Mr. Church's report instead described a recent decline in attendance and engagement.

39. Mr. Church's report listed expectations that included consistent on-site presence and transparency about off-site work. Those expectations were not drawn from a written minimum-hours requirement previously given to Mr. Burns.

40. An internal transmission described Ms. Nickles's account as "a cleaned-up and professional version of the notes you can share with your HRBP."

41. The reasons Defendant later gave Mr. Burns tracked Ms. Nickles's account, including claims that his engagement had declined, meetings had become less structured, information was shared selectively, unannounced meetings left employees uninformed, he struggled with multitasking, he used his phone during meetings, he appeared disengaged, and he lacked sufficient on-site visibility.

42. Defendant continued gathering statements from Ms. Nickles after the December 19 recommendation and immediately before Mr. Burns's discharge.

43. Mr. Church participated in the termination process after allowing Ms. Hayes to work remotely full time and after relying on her to criticize Mr. Burns's on-site presence.

44. Defendant's failure to interview Mr. Burns, its treatment of white employees' presence, its departure from its ordinary corrective process, and the conflict between Mr. Wood's raw note and the report's recent-decline narrative support an inference that Defendant's stated reasons were pretextual.

**D. Defendant discharged Mr. Burns and withheld his bonus**

45. At a meeting at Defendant's home office, Lewis Hoss told Mr. Burns that his employment would end, effective January 8, 2026.

46. Defendant stated that Mr. Burns had performance, engagement, communication, multitasking, phone-use, and on-site-presence deficiencies.

47. None of those asserted deficiencies appeared in a warning, counseling record, negative evaluation, or disciplinary entry previously given to Mr. Burns.

48. Mr. Burns had completed the performance period covering the final two quarters of 2025 before his discharge.

49. Mr. Burns recalls completing and submitting his scorecard for that period to Jess Berkey and Mr. Church. Defendant retains the native scorecard and related communications.

50. Defendant refused to pay Mr. Burns the bonus he earned for the completed performance period.

51. The accepted written offer set the bonus criteria and ceiling without conditioning payment on employment on a later payout date.

## VI. CAUSES OF ACTION

### COUNT I
### TITLE VII RACE DISCRIMINATION
### (AGAINST DEFENDANT)

52. Plaintiff incorporates paragraphs 1 through 51 as though fully restated here.

53. Title VII, 42 U.S.C. 2000e-2(a)(1), prohibits an employer from discharging or otherwise discriminating against an individual because of race.

54. Mr. Burns is Black and Hispanic. Defendant hired him to lead the Brandywine Creek account, and he performed that role for nearly four years without a warning, disciplinary action, or negative evaluation in the produced personnel file. Defendant discharged him on January 8, 2026 in contempt of the company created and imposed anti-discrimination policy. These circumstances support an inference of intentional race discrimination.

55. Mr. Church allowed Ms. Hayes, a white manager at the same account, to work from home full time for approximately six months, then relied on her criticism of Mr. Burns's on-site presence. Mr. Wood recorded that two white predecessors in the same general-manager role had not been on site often and that he had understood it. Defendant gave Mr. Burns no written minimum-hours standard or post-hire correction about his schedule. It gathered accusations from white subordinates, did not interview him, and gave reasons that conflict with Mr. Wood's raw

note that the schedule was longstanding. These facts, together with the absence of a prior negative record, support an inference that the stated reasons were pretextual.

56. Defendant discharged Mr. Burns because of race.

**COUNT II**
**RACE DISCRIMINATION UNDER 42 U.S.C. 1981**
**(AGAINST DEFENDANT)**

57. Plaintiff incorporates paragraphs 1 through 56 as though fully restated here.

58. Section 1981 guarantees all persons the same right to make and enforce contracts as white citizens, including in the performance and termination of employment.

59. Defendant's discharge ended Mr. Burns's employment contract and deprived him of its pay and benefits. Mr. Church allowed a white manager substantial remote-work flexibility while treating Mr. Burns's on-site presence as a reason to discharge him. Mr. Wood recorded comparable absences by two white predecessors in Mr. Burns's role. Defendant also relied on a one-sided inquiry that excluded Mr. Burns and gave reasons that conflicted with its own underlying notes. Mr. Burns alleges that race was a but-for cause of the termination and that Defendant would not have discharged him for the same conduct had he been white. And in fact Defendant have not termination non-Black and Hispanic employee for similar or the same conduct.

**COUNT III**
**RACE DISCRIMINATION UNDER THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**(AGAINST DEFENDANT)**

60. Plaintiff incorporates paragraphs 1 through 59 as though fully restated here.

61. The Elliott-Larsen Civil Rights Act, MCL 37.2202, prohibits an employer from discharging or otherwise discriminating against an individual because of race.

62. Defendant discharged Mr. Burns after nearly four years without a prior negative entry in the produced personnel file. The decision followed an inquiry that relied on white subordinates without interviewing him, although Defendant had permitted or tolerated on-site flexibility for white employees, including two predecessors in his role. Its stated recent-decline reason conflicts with Mr. Wood's note that Mr. Burns's schedule was longstanding. Mr. Burns alleges that Defendant discharged him because of race and caused lost pay, benefits, and other harm.

**COUNT IV**
**BREACH OF CONTRACT. UNPAID PERFORMANCE BONUS**
**(AGAINST DEFENDANT)**

63. Plaintiff incorporates paragraphs 1 through 62 as though fully restated here.

64. Defendant's written offer described a bonus incentive program of up to 12 percent of semiannual salary, allocated among unit financial targets, sanitation and operational targets, and individual unit leadership performance.

65. Mr. Burns accepted the offer and completed the performance period covering the final two quarters of 2025.

66. Mr. Burns recalls satisfying the applicable criteria and submitting his completed scorecard to Ms. Berkey and Mr. Church. Defendant retained the native scorecard and approval records after it ended his access to them.

67. Defendant refused to pay the earned bonus.

68. Defendant's refusal to pay the earned bonus breached the parties' agreement and caused damages in an amount to be established through the scorecard, governing plan, and payment records.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffrey A. Burns requests judgment against Defendant and the following relief:

A. Back pay, lost benefits, and prejudgment interest;
B. Front pay or, in the alternative, reinstatement with appropriate seniority;
C. Compensatory damages under Title VII, 42 U.S.C. 1981, and the Elliott-Larsen Civil Rights Act;
D. Punitive damages under 42 U.S.C. 1981 and Title VII;
E. Payment of the earned performance bonus under Count IV;
F. Reasonable attorney fees, expert fees, litigation expenses, and costs under 42 U.S.C. 2000e-5(k), 42 U.S.C. 1988, and MCL 37.2802;
G. Postjudgment interest as provided by law; and
H. Other legal or equitable relief the Court considers just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

SAG LAW P.C.
/s/Te D. Smith
*NJ-229812017*
332 S. Michigan Ave.,
Suite 121, #5023
Chicago, IL 60604
(708) 433-9138
tsmith@saglawpc.com
Attorneys for Plaintiff Jeffrey A. Burns
October 12, 2026